No. 26,797.

The Ætna Insurance Company et al., *Appellees*, v. Frank L. Travis (William R. Baker substituted), as Superintendent of Insurance, etc., *Appellant*.

### SYLLABUS BY THE COURT.

1. Fire Insurance—*Reasonable Premium Rates — Measure of Disbursements.* In considering receipts and disbursements of stock fire insurance companies, to determine whether certain premium rates yield to such companies a fair return, incurred losses and expenses should not be regarded as the correct measure of disbursements, when such incurred losses and expenses are shown to be substantially greater than losses and expenses actually paid.

2. Same—*Reasonable Premium Rates—Statutory Provision for Computing Unearned Premiums.* The provisions of the statute (R. S. 40-214) concerning unearned premiums of stock fire insurance companies, and prohibiting the regarding of unearned premiums as surplus and disbursing them in dividends before the expiration of the terms of the policies for which such premiums were paid, are designed to secure the solvency of such companies. The provisions of·such statutes are not well adapted to be used in determining reasonable rates.

3. Same—*Reasonable Premium Rates—Premiums Are Receipts to be Taken into Account.* In considering receipts and disbursements of stock fire insurance companies, to determine whether certain premium rates yield a fair return, premiums are receipts to be taken into account, together with other receipts of such companies.

Appeal from Shawnee district court, division No. 1; James A. McClure, judge. Opinion filed November 6, 1926. Reversed.

*Charles B. Griffith*, attorney-general, *John G. Egan, William A. Smith*, assistant attorneys-general, and *John F. Rhodes*, of Kansas City, Mo., for the appellant.

*Robert Stone, George T. McDermott, Robert L. Webb, Beryl R. Johnson, Bennett R. Wheeler, S. M. Brewster, John L. Hunt*, all of Topeka, *E. H. Hicks* and *Robert J. Folonie*, both of Chicago, Ill., for the appellees.

The opinion of the court was delivered by

Harvey, J.: This is a suit in which all the stock fire insurance companies authorized to do business in the state are joined as plaintiffs against Frank L. Travis, as state superintendent of insurance (William R. Baker, successor in office, substituted) defendant, to enjoin defendant from putting into effect an order made by defendant respecting rates of premiums to be charged by plaintiffs upon insurance policies issued by them, upon property in this state. The

Ætna Ins. Co. v. Travis.

evidence was taken before a referee, who made findings of fact and conclusions of law, as shown in the appendix. These were approved by the trial court and judgment was rendered for plaintiffs. The defendant has appealed and complains, among other things, of the rulings denying his motions to modify or strike out certain findings made and for additional findings, but we shall not find it necessary to examine these rulings. We are under much obligation, both to the referee and the trial court, for the evidently painstaking care they gave to the voluminous record and to the numerous questions presented, some of which are novel and unusually important.

After having given notices to plaintiffs, and conducted hearings, which were continued from time to time, defendant, on January 22, 1922, made an order, effective March 1, 1922, decreasing the then existing fire insurance premium rates on certain classes of property, increasing it upon others, and leaving it unchanged upon the remainder; also, decreasing the tornado rate. Before the order became effective this suit was brought. Pending the action, plaintiffs have been permitted, in accordance with the statute (R. S. 40-469), to charge the old rate, where decreases were ordered, and to impound with defendant the difference between the old rate and the new rate, this impounded fund to be disbursed at the end of the litigation to the parties to whom it is adjudged to belong.

Insurance is such an essential part of the commercial activities of our people, as now conducted, that it has become, and is, a business impressed with the public interest (*German Alliance Ins. Co. v. Kansas*, 233 U. S. 389), and thereby subject to reasonable regulations by the state. Most of the fire insurance business is conducted by stock fire insurance companies. It is essential that they be financially sound, and that their premium rates be so fixed that the insurance business conducted by them will produce an income sufficient to pay not only all losses and expenses of the business, but will yield a fair return, considering the hazardous nature of the business.

Plaintiffs contended in the trial court that the order made by defendant was void for the reasons: (1) That no legal notice was given plaintiffs of the hearing upon the proposed change of rates; (2) that no proper hearing was had thereon; (3) that the statutes of this state do not clothe defendant with authority to "fix rates"; (4) that the defendant neglected to "determine" that the existing rates were excessive or unreasonable, which determination is claimed to be juris-

dictional to his right to make such order; and (5) that the order complained of is unreasonable, unjust and inequitable. The first four of these questions were determined adversely to plaintiffs in the court below, and the rulings of the trial court thereon have not been appealed from, hence we may regard these questions as being settled so far as this case is concerned. As to the reasonableness of the order, the court found it proper to consider the tornado business separately from the fire business, and held the order was reasonable in so far as it pertained to the reduction of rates for tornado insurance. From this ruling there has been no appeal, hence the question of the reasonableness of the order, in so far as it pertained to tornado rates, is not before us.

So we have before us, speaking in a large way, the single question: Was the order made by defendant, in so far as it pertains to fire insurance premium rates, unreasonable, unjust and inequitable? The trial court regarded this as including the following questions, each of which was considered and determined:

(1) Is the order void or unreasonable because it attempts to adjust rates according to occupancy or vocational classifications without regard to the fire hazard contained in the individual risks? The trial court held the order made by defendant was not void for this reason. From this ruling there has been no appeal, hence we need give the matter no further attention.

(2) In fixing a rate of the character of the one in question, should it be so fixed as to yield to the companies a fair and reasonable percentage of the underwriting profits independent of the amount of their capital and surplus, or should it be fixed so as to yield a fair return upon the amount of their capital and surplus allocated by some proper method to the state of Kansas? The trial court held that the rate should be fixed so as to yield to the companies a fair and reasonable percentage of the underwriting profits independent of the amount or value of their capital and surplus. In this court the members sitting are equally divided in opinion upon this point, hence no decision is made thereon.

(3) In determining the income of plaintiff companies, should consideration be taken of their investment earnings? The trial court determined this question in the negative. In this court the members sitting are equally divided in opinion upon this point, hence no decision is made thereon.

(4) What is the proper basis upon which to predicate the rate of return? This question presupposes that the rate should be so fixed as to yield to the companies a fair and reasonable percentage of the underwriting profits independent of the amount or value of their capital and surplus, and we shall discuss it upon that supposition, although we have not ourselves decided that point. Therefore, the question before us may be stated: Upon what principle should underwriting profits be computed? or, What premiums shall be considered, and what losses and expenses shall be considered, in determining the underwriting profits of plaintiffs?

Plaintiffs contend that in determining underwriting profits *earned* premiums only, less *incurred* losses and expenses, should be considered. This contention is erroneous as to both items.

Incurred losses and expenses are losses and expenses as originally claimed, and average from year to year from 10 per cent to 12½ per cent more than losses and expenses actually paid. In determining the profits of any business there can be no reason for computing the outgo greater than it actually is. This error alone goes far toward requiring a reversal in this case.

The unearned premium on a policy of insurance is that portion of the premium paid by the insured which would be returned to him by the insurance company upon the cancellation of the policy at any time during the term for which it was written, computed *pro rata* and not at short rates. The earned premium is the difference between the premium paid by the insured and the unearned premium as above defined. For example, if a policy written for a term of a year, on which the premium is $48, is canceled after being in force one month, $4 would be retained by the company as earned premium and $44 returned to the insured as unearned premium. If canceled when the policy had been in force ten months, the company would retain $40 as earned premium and return to the insured $8 as unearned premium. So the question of the amount of the earned premium and of the unearned premium respectively upon any policy is determined as of the date of its computation rather than over any given period of time. In computing the amount of the earned premium or of the unearned premium as of a given date upon all of its outstanding policies an insurance company usually resorts to some general method rather than to undertake the enormous task of computing the exact amount on each separate policy. Some of the

companies make the computation upon an annual basis, regarding all policies written at any time within a given year as though they had been written the first day of July. If the computation be made as of December 31, as it is usually made for the reports to the superintendents of insurance, they credit 50 per cent of the premium on policies written any time within the preceding year to earned premium and 50 per cent of it to unearned premium, if the policy is written for a term of one year. 'If the policy is written for a term of three years, one-sixth of the premium is credited to earned premium and five-sixths to unearned premium. If written for five years, one-tenth of it is credited to earned premium and nine-tenths to unearned premium. Some use another method. But the particular method of making this computation is of little or no importance in this case. There is no actual segregation of the funds either upon the books of the companies, or the manner in which they are invested or handled. All moneys received by plaintiffs are handled as though there were no legal requirements for them to report their earned and unearned premiums separately to the insurance commissioners. Of money received from whatever source,' a sum estimated as sufficient to pay current losses and expenses is kept on hand, or readily available; the balance is invested as required by statute. It is only when compiling a report of the condition of the company as of a specific date, as for making annual reports to state insurance departments, that attention is paid to the matter of earned and unearned premiums, which are then computed by a formula, as above indicated. It will be noted that when the unearned premium is so computed it exceeds the amount of the earned premium; for it contains 50 per cent of the premiums on policies written for one year, $83\frac{1}{3}$ per cent of the premiums on policies written for three years, and 90 per cent of the premiums on policies written for five years. Plaintiffs did contend that this entire unearned premium should be disregarded in computing their income for rate-making purposes, that only the earned premium should be considered. As the commission and other expenses of procuring the business amount to more than the earned premiums on policies written for three and five years and consume a large part of the earned premiums on policies written for one year, plaintiffs argue that they are conducting their underwriting business at an actual loss, and that the more policies they write and the greater the increase of their underwriting business, the greater is their

loss on their underwriting business. The trial court adhered to the theory of plaintiffs that underwriting profits should be computed on the basis of earned premiums, less incurred losses and expenses, but as to the earned premiums did not follow out plaintiffs' contentions in full. To the earned premiums as above computed the court added 35 per cent of the unearned premiums, and from that deducted the incurred losses and expenses. This 35 per cent was arrived at in this way: An insurance company desiring to reinsure its business and liquidate its affairs can usually effect such reinsurance for 70 per cent of its unearned premiums, hence the court concluded that at least 30 per cent of the unearned premiums might properly be regarded as ultimate profit, and then, on the theory that the reinsuring company would not take the business and pay 70 per cent of the unearned premium unless it could do so at a profit, an additional 5 per cent was added. By this method of computation 65 per cent of the unearned premium was disregarded in computing income of plaintiffs on their underwriting business. There was no further direct showing of the actual profits accruing to insurance companies out of unearned premiums, but in computing losses and expenses all losses were charged up against current receipts. There is no showing or any intimation in the evidence that losses in a given year, although they occurred under policies written two, three or five years prior thereto, were in fact paid out of unearned premiums of previous years. Treating the matter in this light the entire unearned premium should be regarded as income or assets of the plaintiffs.

Plaintiffs are correct in arguing, as they do, that the unearned premium paid to the insurance companies is as much a part of their property and assets as any of their other property, and that it is distinguished from their other property only in the respect that by statute they are not permitted to regard it as a surplus and disburse it to their stockholders in dividends prior to the termination of the terms of the policies. But plaintiffs are incorrect in saying that no part of it, or that only some certain portion of it, should be treated as income of the company for rate-making purposes. If all expenses and losses are paid from current receipts, even though the losses occur under policies written in previous years, and if all of this is paid from earned premium, then the unearned premium is not only an income and an asset of the company, but it is in fact profit arising from the underwriting business. If any part of the unearned premium is, or

was during the test period, used for the payment of losses or expenses, a showing should have been made of the amount or portion so used, and the amount or portion not used, which showing would demonstrate what part of the unearned premium is really profit; and this, would have been much more accurate than an estimate formed from a consideration of the amount of the unearned premium necessary to effect a reinsurance and the possible profit of the reinsuring company therein.

We escape all conjecture arising out of the consideration of earned premiums and unearned premiums when we consider the true situation; that is, the statutory requirement (R. S. 40-214) for the computation of unearned premium, otherwise called premium reserve, and the statutory restriction against the distribution of this premium reserve to stockholders in dividends, is designed as a measure of the solvency of insurance companies. It is not well adapted to be used in the consideration of the question of reasonable premium rates. A consideration of such rates will be less complicated by disregarding statutory provisions designed only for the purpose of attempting to secure the solvency of such company.

In *Ætna Ins. Co. v. Hyde*, 285 S. W. 65 (Mo.), plaintiffs made a similar contention to the one made by them here; that the statutory provision for computing unearned premiums, and prohibiting their disbursement as dividends until the terms of the policies had expired, designed as a test of the solvency of the companies, should be used in computing their profits in determining whether the premium rates yield a fair return. The court declined to take that view, discussing the matter at length. Among other things it was said:

" . . . The solvency test is no test at all. . . . The referee, in holding with the plaintiffs in that matter, says that method of arriving at the earnings is not satisfactory. It is not only unsatisfactory; it is utterly indefensible. . . . " (p. 72.)

Plaintiffs cite and rely on *Sun Insurance Office v. Clark*, decided by the English house of lords (1912) A. C. 443, in support of their contention that the unearned premium, or premium reserve, should be disregarded in computing their profits. All that was really decided in that case is that the question of what are the profits or gains of an insurance company for a given year, for the purpose of computing the income tax, is a question of fact, and where there is a controversy as to which of two or more methods should be used, that

method should be used which shows the true gains or profits. In that case the insurance company wrote policies for one, three, five and seven years. Under its method of transacting business, paying losses and keeping its books, it carried forward each year 40 per cent of the premiums received during the year as a premium reserve to pay losses on policies written during that year which might accrue under the terms of the policies in future years. The tax commissioner, after examining the records of the insurance company, conceded that this was a fair estimate of the amount necessary to pay such losses, and this was conceded by the government at the trial. The court held that since this method was conceded to be correct on the facts, it should be allowed. The court took pains to explain its previous decision in *Life Assurance Corp. v. McGowan* (1908), A. C. 207, where it had been held that of the three methods suggested to them in that case the one proper to be used was to deduct the amount of the total losses and expenses paid during the year in question from the gross receipts of that year, the difference to be the profit or gain upon which the tax was to be computed. That method was adopted in that case for the reason that it was the one found to produce the most accurate results. In *Sun Insurance Office v. Clark,* supra, the government contended this was announced as a rule of law as the proper method of determining profits, but this contention was denied, and it was pointed out that what are the real profits or gains is in every case a question of fact; that no method used or approved should be regarded as the approval of that method as a question of law, but only because in the particular case it was shown to have produced correct results.

In determining income of plaintiffs, premiums are receipts to be taken into account.

In *Sun Insurance Office v. Clark,* supra, Lord Alverstone said:

"Premiums are not profits or gains, they are receipts which must be brought into account, and out of which, after proper deduction for losses, profits will accrue." (p. 457.)

In computing income, or profits, of plaintiffs on their underwriting business nothing is gained by dividing premium receipts into two parts—earned premiums and unearned premiums. Such a division only complicates the computation. All premiums should be regarded as receipts, which, together with other receipts, if any, of the underwriting business, constitute the income for the period under consid-

eration. From the amount of such income should be deducted actual losses and expenses, the difference representing gains, or profits. This may give an accurate result, as in McGowan's case, *supra*. If, in fact, a part of such receipts is set aside as a reserve to pay future expenses and losses on existing policies—a reserve which is actually used for that purpose—and the necessary amount of such reserve is shown by the evidence, or agreed upon between the parties, it is proper in determining such profits of plaintiffs to deduct the amount of such reserve from such receipts, as was done in *Sun Insurance Office v. Clark,* supra. A method of computing profits is sound in law only when the evidence shows that it reaches a sound result. It cannot be regarded as sound when (1) it treats losses and expenses as being substantially more than the amount necessary to pay them, and (2) disregards 65 per cent of unearned premiums, without a showing of the amount, if any, of expenses and losses paid therefrom. Before plaintiffs can properly contend that any part of their underwriting receipts should be set aside as a reserve to pay future losses and expenses on existing policies, and for that reason deducted from such receipts in computing their profits, it was incumbent upon them to show the amount necessary for that purpose and that such expenses and losses were in fact paid from such fund. If future losses and expenses on existing policies are in fact paid from future receipts, there is no reason for allowing the setting aside of such reserve.

In this case plaintiffs contended that the unearned premium, or premium reserve, should not be taken into account in computing their profits, and yet it is these same unearned premiums which ultimately become surplus, to be disbursed to stockholders as dividends, or retained as additional surplus, adding to the value of capital and used in the insurance business. Plaintiffs' contention presents a *non sequitur* of extraordinary beauty. It has no merit, and cannot be sustained. The fallacy arises from attempting to apply the statutory solvency test to a computation of profits, and in not regarding all premiums as receipts to be taken into account, as hereinbefore discussed. And the variation from plaintiffs' contention, made by the referee and trial court, of adding 35 per cent of unearned premiums to earned premiums for the purpose of computing income or profits of plaintiffs, is but little better, since it is not based, and does not purport to be based, upon any actual showing of the true amount of unearned premiums which are in fact earnings or profits. From

what has been said it necessarily follows that the method of the referee and trial court of treating premiums in computing the income or profits of plaintiffs is erroneous and cannot be sustained.

The referee found that unless the method employed by him in determining underwriting profits—that is, of deducting incurred losses and expenses from earned premiums, plus 35 per cent of un- earned premiums—was correct, then the order sought to be enjoined is not unreasonable. We have determined that this method is incorrect.

Other questions, some of them pertaining to procedure, are argued by the parties, but we do not find it necessary to refer to them.

From what has been said it necessarily follows that the judgment of the court below be reversed, with directions to enter judgment for defendant. It is so ordered.

BURCH and MARSHALL, JJ., dissenting.

HOPKINS, J., not sitting.

---

## APPENDIX A.—REPORT OF REFEREE.

### FINDINGS OF FACT.

1. That in determining whether rates are reasonable, fire and tornado in- surance should be considered separately and independent of one another. In the determination of this question, in so far as it relates to fire insurance, the amount of such insurance written by the plaintiffs should be considered in the aggregate; that is to say, total income on all classes of risks should be compared with total outgo. It is not proper to divide such risks into classes.

In determining the question of rates, the area considered should be the entire state and the time ten years. In all my calculations I have used the figures from 1913 to 1922, inclusive. I have used this period because it was the only one of ten years for which both sides submitted figures and computa- tions.

2. That five per cent of the written premiums is a fair underwriting profit.

That, the nature of the business considered, this percentage will always be a varying figure and the whole body of rates should not be changed unless that figure exceeds seven per cent or falls below three per cent.

That no additional allowance should be made for so-called "conflagrations" or "catastrophes."

That in computing underwriting profits, earnings on investments should not be considered.

3. The actual underwriting profits of the plaintiffs during the period in question on all lines of insurance, was $5,745,508.

The effect of the rate order is to reduce earnings approximately five per

cent of the written premiums. Therefore, had the order been in effect during this period the underwriting profits would have been approximately $1,245,508. These results are arrived at as follows:

| | | |
|---|---|---|
| Premiums earned | | $85,975,248 |
| Loss incurred | $45,142,514 | |
| Expenses incurred | 37,051,850 | |
|     Total | | 82,194,364 |
|     Balance | | $3,780,884 |
| Difference between unearned premium reserve at beginning and end of period | $5,613,212 | |
| (Add) Thirty-five per cent thereof | | 1,964,624 |
|     Total underwriting profit | | $5,745,508 |
| (Subtract) Effect of rate order (estimated) | | 4,500,000 |
|     Underwriting profit with rate order applied | | $1,245,508 |

NOTE.—The 35 per cent of the difference in unearned premium reserve is added because of prepayment of expenses as explained in memorandum.

The underwriting profit was 6.29 per cent of the written premiums, which I find is not unreasonably high.

Had the rate order been in effect the underwriting profit would have been 1.35 per cent of the written premiums, which I find is unreasonably low.

4. Underwriting profits of the plaintiffs during the period in question on the "earned" basis, without making any allowance for prepayment of expenses, was $3,780,884.

Had the rate order been in effect, the underwriting loss on this method of computation would have been approximately $718,716. This result is arrived at as follows:

| | | |
|---|---|---|
| Premiums earned | | $85,975,248 |
| Losses incurred | $45,142,514 | |
| Expenses incurred | 37,051,850 | |
| | | 82,194,364 |
| Underwriting profit | | $3,780,884 |
| (Subtract) Effect of rate order (estimated) | | 4,500,000 |
| Underwriting loss with rate order applied | | $718,716 |

The underwriting profit on the "earned" basis was 4.1 per cent of written premiums, which I find is not unreasonably high.

Had the rate order been in effect, the underwriting loss would have been .075 per cent of the written premiums, which is confiscatory.

5. The underwriting profits of the plaintiffs on the basis of written premiums and incurred losses and expenses for the period in question was $9,386,723.

With the rate order in effect, the profits on the "written" basis would have been approximately $4,886,723. This result is arrived at as follows:

| | | |
|---|---|---|
| Premiums written | | $91,581,087 |
| Losses incurred | $45,142,514 | |
| Expenses incurred | 37,051,850 | |
| | | 82,194,364 |
| Underwriting profit | | $9,386,723 |
| (Subtract) Effect of rate order (estimated) | | 4,500,000 |
| | | $4,886,723 |

Underwriting profits on the "written" basis were 10.2 per cent of the written premiums, which I find to be unreasonably high.

With the rate order in effect, profits on the "written" basis would have been 5.3 per cent of the written premiums, which I find not to be unreasonably low.

6. Underwriting profits of the plaintiffs on tornado insurance, computed on the earned premium basis without any allowance or prepayment of expenses for the ten-year period, was $2,040,873, which is 21.0 per cent of the written premiums, which I find to be unreasonably high. With the rate order in effect, on the same basis, profits would have been something over $1,000,000 or approximately 11 per cent of the written premiums, which I find not to be unreasonably low. This result is arrived at as follows:

| | |
|---|---|
| Premiums earned | $9,220,203 |
| Loss incurred .................$3,129,917 | |
| Expenses incurred ................ 4,049,413 | |
| | 7,179,330 |
| Underwriting profit | $2,040,873 |
| (Subtract) Effect of rate order (estimated) | 900,000 |
| Underwriting profit with rate order applied | $1,140,873 |

NOTE.—The effect of the rate order on tornado insurance is an estimate, because the tornado insurance on some classes of risks was not changed. However, the reduction could not in any event be more than 10 per cent of the written premiums.

7. Of all the classes of insurance affected by the order, tornado insurance is the only one I find to be unreasonably high. Had the rate order been in effect *only* on tornado insurance during the ten-year period, the underwriting profits of plaintiffs on all lines of insurance would have been approximately $4,850,000, which is equivalent to 5.28 per cent of the written premiums, which I find is a reasonable return.

I find that the order, in so far as it applies to tornado insurance, is reasonable, and that if sustained the underwriting profits of the plaintiffs on tornado insurance alone will not be unreasonably low and that the underwriting profits of the plaintiffs in the aggregate on all lines of insurance will be fair.

8. For the periods of 1913 to 1917, 1918 to 1922, and 1913 to 1922, the United States net premiums, United States unearned premiums, Kansas net premiums, Kansas unearned premiums, Kansas earned premiums, Kansas losses incurred, and Kansas loss ratios as taken from the annual statements of the stock fire insurance companies doing business in the state of Kansas during these several periods, or computed therefrom, are found to be as follows:

| | U. S. net premiums. | Kansas net premiums. | Kansas earned premiums. | Losses incurred. | Ratio of losses incurred to premiums earned. |
|---|---|---|---|---|---|
| 1913-1917 | $1,444,671,608 | $29,874,165 | $28,306,828 | $17,912,464 | 63.27 % |
| 1918-1922 | 2,851,430,199 | 61,985,508 | 57,864,950 | 27,419,235 | 47.39 % |
| 1913-1922 | 4,296,101,807 | • 91,859,673 | 86,171,778 | 45,331,699 | 52.606% |

NOTE.—There is a slight discrepancy between the Kansas net premium figures and the Kansas earned premium figures quoted in this finding and those used in findings numbered 3, 4 and 5. This is occasioned by the different methods of computation used and because of the large mass of figures from which these results were obtained, which naturally produced some slight errors. However, the differences are so small that they do not affect in any way the final result. So that for all practical purposes they may be treated as being identical.

9. On the basis of Kansas premiums ($9,859,000) to United States premiums ($4,296,101,000) the share of the total capital and surplus of all companies doing business in the. state apportioned to Kansas for the ten-year period, would be approximately $74,000,000.

On the same basis the share of the *"paid in"* capital and surplus apportioned to Kansas would be approximately $56,000,000.

10. On the basis of amount of risk in Kansas ($9,764,000,000), the amount of risk in the United States ($988,178,000,000), the capital and surplus apportioned to Kansas for the ten-year period would be approximately $37,000,000.

On the same basis the *"paid in"* capital and surplus apportioned to Kansas would be approximately $28,000,000.

Note.—The total capital and surplus of the companies used in findings numbered 9 and 10 is as of December 31, 1921.

11. I find that it is not proper to allocate capital and surplus to Kansas on any basis for determination of any of the questions presented in this case. However, if any allocation is to be made, I find the one computed on Kansas premiums compared with United States premiums, of the total capital and surplus (which allocates to Kansas $74,000,000 of such capital and surplus), to be correct.

12. If it is proper to allocate capital and surplus to Kansas for the purpose of computing underwriting profits, which I do not believe, I find that there should be added to such allocated capital and surplus ten per cent thereof, the same being the value of plaintiffs' interest in the agency plants in the state.

Note.—The figures above quoted as to capital and surplus cannot be exact, and are not exact, for the reason that foreign companies, which do a substantial share of the business in the state, make no return of their total capital and surplus, but only make a deposit in this country, which entitles them to do business. However, the figures are not far from the truth.

13. The investment earnings of plaintiffs, inclusive of gains from increases in market value of securities not sold in the United States for the ten-year period, amounts to $289,102,380. Gains in market value of securities not sold are not in reality earnings, but no evidence was introduced of what such gains amounted to. Therefore, if we are to consider the figure at all, we must use it as it stands.

If it is proper to allocate any portion of such earnings to Kansas to be considered in the making of rates, then on the basis of Kansas premiums to United States premiums the amounts so allocated to Kansas would be approximately $5,782,047.

On the basis of amount at risk in Kansas to amount at risk in the United States, the investment earnings allocated to Kansas would be approximately $2,891,023.

I do not believe any such allocation should be made, but assuming that it should be made, the basis of Kansas premiums to United States premiums is the correct method to be used.

14. Prior to 1918, the 1909 edition of the Analytic Schedule was in use in Kansas. Just prior to 1919 an application was made by the plaintiff companies to substitute therefor the 1914 edition, which was somewhat different. Representatives of the insurance department and the companies together made an investigation of the effect the proposed schedule might have on existing rates, and after such investigation the application of the companies was granted and the 1914 schedule adopted.

Such adoption required the rerating of all the towns in the state and such rerating in many instances showed a change in the rates, sometimes higher, sometimes lower, but on the whole the rates were slightly higher.

I am unable to say, however, that this increase was due to the application of the new schedule. Rate changes in the same risk might be caused by so many different factors, such as change of occupancy, change in exposures, the introduction of new hazard in a building, etc., that it is impossible for anyone to determine with any degree of accuracy what elements were responsible for such changes.

### Additional Findings of Fact by the Referee.

1. Since the filing of my report herein my attention has been called to the fact that after the conclusion of the taking of testimony amended figures concerning the earned premiums in the United States and Kansas were by agreement of the parties introduced in evidence by the defendant.

The defendant claims that plaintiffs agreed such amended figures were correct. This plaintiffs deny.

The fact is that after defendant asked permission to introduce such amended figures in evidence, plaintiffs by letter to me agreed they might be introduced without the necessity of calling any witnesses to identify or verify them, but there was no specific admission that such figures were correct, neither was their correctness challenged. However, whether we use the original or amended figures is of no consequence. It is true the amended figures increase the earned premiums of the plaintiffs in Kansas over the ten-year period by approximately $200,000, but such figures also increase the outgo of plaintiffs over the same period in approximately the same amount, leaving the underwriting profits (and that is what we were seeking to determine) in each case approximately the same. The amended figures as taken from defendant's Exhibit No. 17 show the following:

```
Earned premiums ..........................................$86,171,778
Losses and expenses incurred ..............................  82,383,549
                                                            ─────────────
    Underwriting profit ....................................  $3,778,229
```

Under the original figures as used by me in my report the underwriting profit was $3,780,884, a difference between the two of approximately $2,600, and that difference in favor of the defendant.

2. Defendant takes the position that he is not contending for the so-called "written" basis in determining the underwriting profits. There is therefore no occasion for finding No. 5 of my original report, and there will be substituted in its place what defendant says is the proper method, which is the following:

Add to the incurred losses and expenses 52.35 per cent of the increase in unearned premiums between the beginning and end of the period in question (1913 to 1922, inclusive), and substract the sum total from the net written premiums.

That method gives this result:

| | | |
|---|---:|---:|
| Net written premiums | | $91,859,673 |
| Loss incurred | $45,331,699 | |
| Expense incurred | 37,051,850 | |
| Plus amount to be paid for loses and cancellation on outstanding policies after expiration of the premium period, or 49.35 per cent for losses plus three per cent for cancellations, equals 52.35 per cent of the increase of the unearned premiums ($5,613,212), equals, | 2,938,516 | |
| Total outgo | | 85,322,125 |
| | | |
| Underwriting profit | | $6,537,548 |
| Subtract effect of rate order (estimated) | | 4,500,000 |
| | | |
| Underwriting profit with rate order applied | | $2,037,548 |

The difference between this plan as contended for by the defendant and what I believe to be the correct method as set out in my finding No. 3, is that under the defendant's plan nothing is set aside or reserved to take care of the expenses on unexpired policies after the end of the current year in which they are written, and this I think is not proper.

While it is true that the major portion of the expenses of writing a policy are incurred in the year in which they are written, it is also true that there are some expenses connected with such policies which come after the end of the year in which they are written, and provision should be made for such expenses. There is the general overhead of carrying on the business, and each policy should pay its proportionate share of such overhead. There are adjustment expenses and legal expenses when losses occur and each policy should pay its proportionate share of those. In determining the income tax to be paid by the companies, their profits are computed upon the earned basis, this being provided for by federal statute, so that as portions of these unexpired policies become earned in the future such earned portions go into income and a tax must be paid thereon, and it is proper that each policy should pay its proportionate share of such tax.

I think, therefore, that in so far as the method contended for by the defendant fails to make any provision for future expenses on unexpired policies, it is not correct.

### Conclusions of Law.

1. The insurance rates existing on tornado insurance are, and were at the time the order was made, excessive and unreasonably high; the rates ordered are reasonable; therefore, the order in so far as it applies to tornado insurance should be sustained.

2. The insurance rates existing on all lines of insurance, other than tornado, are not and were not at the time the order in question was made, excessive or unreasonably high; the rates ordered are unreasonably low; therefore, the order in so far as it applies to such other lines should be set aside.

GILBERT H. FRITH, *Referee.*

### Addenda.

For the convenience of the court I will here set out what I regard as appropriate conclusions of law if certain theories of computing profits and determining what are reasonable rates, other than the ones adopted by me, are used.

1. If it is proper to compute underwriting profits on the so-called "written" basis as contended for by the defendant, then the order in its entirety should be sustained, regardless of every other consideration.

2. If earnings from investments, as such earnings are shown in the findings, are to be added to underwriting profits and considered in the making of rates *and* such earnings are allocated to Kansas on the basis of Kansas premiums to United States premiums, then the order in its entirety should be sustained, regardless of the method used in determining underwriting profits.

3. If earnings from investments are to be considered in the making of rates and such earnings are allocated to Kansas on the basis of amount at risk in Kansas to amount at risk in the United States, then the order in its entirety should be sustained, *unless* it is found that the correct method of computing underwriting profits is on the "earned" basis without making any allowance for the prepayment of expenses, in which event the order should not be sustained except in so far as it applies to tornado business.