HUTER, INTERVENER, *v.* THE UNION TRUST COMPANY, RECEIVER OF THE MUTUAL LIFE INSURANCE COMPANY.

[No. 18,650.    Filed October 6, 1899.]

BUILDING AND LOAN ASSOCIATIONS.—*Insolvency.*—*Insurance Company Doing Building and Loan Business.*—A company was incorporated under the act for the incorporation of mutual life and accident insurance companies.    It was provided in its articles of incorporation that all moneys belonging to it, except expense funds, might be loaned in any manner provided for in the policies or certificates of the corporation.    Loans were made on the building and loan plan. The company became insolvent and passed into the hands of a receiver.    Appellant intervened in the receivership case and asked that a bond given by him to the insolvent for a loan be found paid and ordered canceled.    *Held,* that appellant is chargeable with the amount of money received by him, with six per cent. interest from date, less the amounts paid as interest and premium, or "additional dues," under the loan certificate, and less the amount paid the receiver, and all other sums paid, except stock dues, to be computed as partial payments; and is entitled to share in the residuum on the basis of the amount of stock dues paid.

From the Marion Superior Court.    *Reversed.*

*Pliny W. Bartholomew* and *Duane H. Bowles*, for appellant.

*Albert J. Beveridge*, for appellee.

BAKER, J.—The Mutual Life Insurance Company of Indiana is an insolvent corporation in the hands of appellee as receiver. Huter intervened in the receivership case and asked that a bond and mortgage given by him to the insolvent be found paid and ordered canceled. The special finding discloses substantially these facts:

(1) The insolvent was incorporated in 1882 under the act for the incorporation of mutual life and accident insurance companies. Acts 1865 p. 114, §3763 R. S. 1881, §4895 Burns 1894.

(2) The articles of incorporation provided that the business of the company should be the issuing of "policies of insurance on the lives of persons applying therefor, during the life of the applicants or for any determinate period, or upon the endowment plan, and upon such amounts, values, and upon such conditions as may be agreed upon and stipulated for in any policy issued"; and also that all policies or certificates should be upon any system of business adopted by the directors.

(3) The articles further provided that the corporation "might loan all moneys belonging to it, except expense funds, in any manner provided for in the policies or certificates of the corporation".

(4) On August 1, 1891, the company issued to Huter a certificate, of which a copy is attached to the petition. This "share certificate" provided, among other things, that "in consideration of the payment of eighty cents each month for each share for the term of seventy-two months from date, this association promises to pay Huter $100 for each share, the shares to become due and payable when the monthly dues paid thereon together with all profits on the same shall equal $100 for each share"; and also that "upon the above named

shareholder's obtaining a loan·from this association, this cer-
tificate shall be surrendered and a 'loan certificate' issued
in lieu thereof". A further provision was that, in case of
Huter's death within six years, his wife should receive such
proportion of $100 on each share as the time the certificate
was in force bore to the whole time. Various articles,
similar to ordinary rules of building and loan associations,
were set out on the face of the certificate. Among them
was this: "One-tenth of one per cent. upon the par value
of each share shall be deducted from the receipts of each
month, which together with the membership and other fees
shall go to the managers of the association to defray expenses,
and no shareholder shall be required to contribute anything
more to the 'expense fund'; and all other moneys received
on all shares in force shall go to the 'loan fund' for loaning
and for paying shares at maturity."

(5) Under this certificate, for six shares, Huter made
thirteen monthly payments of $4.80 each, from which the
company deducted sixty cents for expenses each month.

(6) On August 30, 1892, Huter surrendered the above
mentioned certificate and received in lieu thereof a second
or "loan" certificate, of which a copy is attached to the
petition. This certificate is the same as the first except that
it, being a loan certificate, does not provide for exchanging
for a loan certificate, and except that it calls for "the pay-
ment of $1.30 each month for each share from date of the
loan made hereon, for the balance of the term of seventy-two
months" from date of original certificate.

(7) On May 9, 1892, Huter applied to the company for
a loan of $600, and on August 30, 1892, the loan was made
on the bond and mortgage set out in the petition. In the
bond, Huter acknowledged his indebtedness to the company
in the sum of $600, with interest at six per cent. per annum,
payable in advance in monthly instalments; and agreed to
pay the monthly dues, fines and interest as set forth in the
certificate and bond "until said share certificate matures as

Huter v. Union Trust Co., Rec.

therein provided, and upon maturity of said share certificate this bond shall mature and each shall operate as a payment of the other, in full satisfaction thereof, as concurrent mutual obligations". The mortgage was given to secure the performance of the conditions of the certificate and bond.

(8) Under the second certificate, down to the appointment of the receiver, Huter made fifty-six monthly payments of $7.80 each and one fractional monthly payment of $6.40, from which one-fifth of one per cent. of the par value of the shares was deducted monthly for expenses.

(9) Under the bond, down to the appointment of the receiver, Huter paid fifty-six monthly interest payments of $3 each and one fractional monthly payment of $1.65.

(10) Down to the appointment of the receiver, Huter performed all of the conditions, of the certificate and bond on his part. Since then, he has paid the receiver $39, which was credited on the principal of the loan. .

(11) The company was never incorporated under the building and loan laws. In its building and loan department it issued various kinds of certificates. As a mutual insurance company, it never took any premium notes.

(12) In 1893 an act was passed entitled "An act to legalize the incorporation of the Mutual Life and Endowment Association of Indiana, and to legalize all the acts of said corporation, and all the contracts made by said corporation to and with all persons whatever, and all the official acts of the board of directors thereof, and declaring an emergency therefor." Acts 1893 p. 192.

(13) In 1895 an act was passed changing the name of the company from The Mutual Life and Endowment Association of Indiana to The Mutual Life Insurance Company of Indiana, saving all rights. Acts 1895 p. 150.

(14) On July 14, 1897, in the Marion Superior Court, the company was adjudged insolvent and appellee was appointed receiver. Appellee at once qualified and entered upon the discharge of its duties.

(15)   The funds of the company were derived from the payments made by the certificate holders under their several certificates similar to those of Huter, and from interest on moneys loaned; and all the loans to the certificate holders, including the loan to Huter, were made out of moneys paid in by certificate holders in the building and loan department. No loans were made in the insurance department.

(16)   All moneys received were paid into a common treasury, but separate books were kept for each department. The books of the insurance department show that all moneys received in that department were paid out for expenses. The books of the building and loan department disclose the individual accounts with shareholders and the amount belonging to that department.

(17)   The assets of the company in the hands of the receiver consist partly of cash but chiefly of loans made to certificate holders. All of these assets were derived from moneys paid in by certificate holders, some of whom borrowed from the funds so paid in, while others did not.

(18)   The company has not credited the certificate holders with any earnings or profits; and the evidence does not show that the company made any profits upon the money paid in.

(19)   The creditors consist almost exclusively of the certificate holders, some of whom are borrowers and some not borrowers. Practically all of them have filed with the receiver their claims for the amounts paid in by them.

(20)   A large number of certificate holders who were borrowers have paid their loans in full.

(21)   Before bringing his action, Huter demanded of the receiver the cancelation of his mortgage. Receiver refused. Thereafter and before bringing his action, Huter tendered the receiver the difference between the face of his loan and the amount he had paid in under his certificate and demanded the cancelation of his mortgage. Receiver declined to accept the money on that condition, but offered to apply it on the loan.

(22) About August 1, 1891, at the instance of an agent of the company, Huter called at the company's office and was told by the agent in charge that the company had a building and loan department and did a building and loan business. Relying on this, Huter subscribed for six shares of stock, supposing and believing that he was investing in running or investment stock in a building and loan association. He received and retained the certificates and executed the bond and mortgage hereinbefore described. He received a pass-book, on the cover of which appeared: "Six shares. No. 15,107. $600. Building and Loan Department of the Mutual Life and Endowment Association of Indiana. Incorporated February 7, 1882. Charter perpetual. Frank S. Huter, No..... Street, Brightwood. Date of certificate, August 1, 1891. Monthly dues, $7.80; monthly interest, $3.00; total, $10.80. Always send this book with your remittance. To avoid paying fines, all dues must be paid by the 15th of each month." Huter never made any examination of the articles of association on file in the public records, or any further examination into the character of the company, and never sought nor took any part in the management of its business. He resided in a suburb of Indianapolis. The home office of the company was in that city.

The conclusions of law were that Huter was not entitled to set off against the loan any payments made by him under the certificates; that he should pay the full amount of his loan; and that he should receive distribution upon the full amount paid in by him, except the interest payments.

The company is dead; the court is administering upon the estate; claims against the assets are pending. In this suit, the receiver represents all who have an interest in the assets adverse to Huter's contentions. The problem is to determine the rules for settling the estate.

Separate accounts were kept of the transactions in the "insurance" and in the "building and loan" departments. No assets from the "insurance" department came to the receiver. Claimants against that department have no interest in the fund. After costs and the company's expense-debts are paid, the balance must be distributed. The assets are what is left of the "loan fund" and consist of cash and evidences of loans to holders of certificates similar to Huter's. The "loan fund" was created from payments by "borrowing" and "non-borrowing" certificate holders. Plainly, the court must divide the remnant of it among them.

Huter claims that the division should be made by giving the borrowers, out of the notes, 100 cents on the dollar of their payments under their certificates, and the non-borrowers out of the cash, twenty cents, say, on the dollar of their payments under their certificates, because the building and loan contracts are illegal and void and thus nothing is left, so far as borrowers are concerned, but accounts for money had and received to be offset.

The company was chartered to write life insurance. It had no powers except those specifically granted in the governing act and those necessary to effectuate the powers expressly given. In conducting a "building and loan" business, its acts were *ultra vires*. The act of March 3, 1893, did not, nor did it purport to, legalize the building and loan business, but only the life insurance business of the company. The State could and should have restrained the company from going beyond its charter. Its executory contracts for the issuance of building and loan stock and the making of loans on the building and loan plan could not have been specifically enforced. But those are matters of the past. There is no *ultra vires* business for the State to enjoin. No executory contracts looking to the doing of things *ultra vires* are involved. What was done is done. There was an existing corporation. It had power to loan its own funds. The building and loan business is lawful in

itself. *Security Savings, etc., Assn.,* v. *Elbert, ante,* 198. Simply, this corporation, with power to loan, was lacking in power to gather in and put out funds on the building and loan plan. But it did do it. For a long period of years it held itself out to the public as having the right to do so. Huter and very many others jointly made up, through the "building and loan" department, the "loan fund" from which loans were made to various ones of themselves. The receiver contends that it might well be held that Huter and others similarly situated should not be permitted to defeat the enforcement of the contracts by pleading *ultra vires.*

But that is not the bottom question,—because it leaves out of view the effect of insolvency. If these borrowers and non-borrowers had been doing business through a duly authorized building and loan association, its insolvency would have abrogated the stock and loan contracts—the situation would be treated by the courts as though the contracts had never existed—equity would administer, not according to the contract relations of the parties, but according to their actual relations resulting from what they had done, and according to the nature and source of the fund and of the claims upon it. *Marion Trust Co.* v. *Trustees of Edwards Lodge, ante,* 96. An allowance of the plea of *ultra vires* could not wipe out the contracts more thoroughly. In either case, the claimants would stand before the court on a footing of equality. If they engaged in an authorized building and loan business, they would be equally innocent; if in an unauthorized, equally blamable.

The situation governs,—not the forms under which it has arisen. Whether the fund and the claims result from the insolvency of a life insurance, fire insurance, building and loan, savings bank, or any other enterprise, if the court finds in its hands assets, which were made up from the contributions of claimants, and from the profits of handling which, if profits had been made, those claimants would have been entitled to dividends, no claimant whose debt is a part of

the assets may set off against his debt the amount of his contributions as investor, but must pay his debt in full, to the end that the losses shall be borne by those who would have shared the profits, and in the same proportions. *Marion Trust Co.* v. *Trustees of Edwards Lodge, supra,* and cases there cited; *Wohlford* v. *Citizens, etc., Assn.,* 140 Ind. 662, 29 L. R. A. 177; *Osborn, Rec.,* v. *Byrne,* 43 Conn. 155, 21 Am. Rep. 641; *Stockton,* Atty.-Gen., v. *Mechanics, etc., Bank,* 32 N. J. Eq. 163; *Hannon* v. *Williams, Rec.,* 34 N. J. Eq. 255, 38 Am. Rep. 378; *Lawrence, Rec.,* v. *Nelson,* 21 N. Y. 158; *Newcomb, Rec.,* v. *Almy,* 96 N. Y. 308; *Hillier* v. *Allegheny, etc., Ins. Co.,* 3 Pa. St. 470, 45 Am. Dec. 656; *Long* v. *Penn Ins. Co.,* 6 Pa. St. 421; *Care, Rec.,* v. *Brown,* 31 Pa. Weekly Notes 501.

Huter complains of the overruling of his demurrer to the receiver's answer to the second and third paragraphs of the petition. These paragraphs count upon the certificates as valid contracts, aver that Huter has fully performed all the conditions on his part, and ask that the amount due him under the certificates be set off against his bond and mortgage. The certificates, bond and mortgage are made parts of these paragraphs. It is specifically shown that Huter paid in but $87.10 on each share and that no profits were made and that the company is hopelessly insolvent. These specific averments, in connection with the condition in the certificate that the shares shall become due and payable "when the monthly dues paid thereon together with all profits on the same shall equal the sum of $100, for each share", overcome the theory that, before the receiver was appointed, a sum was due Huter under the terms of the certificate, which, upon the appointment of the receiver, he was entitled to have set off against his obligation in the receiver's hands. These paragraphs are bad and it is immaterial what the answer was.

It is urged in Huter's behalf that he is entitled to the set-off by reason of the company's representations. These were "that the company had a building and loan department

and did a building and loan business." If the false representations that the company was duly authorized to have such a department and do such a business are implied, the estoppel (which would depend upon Huter's right to ignore the governing act and the company's recorded articles) would entitle him only to insist that the court treat the false representations as true.

Under the first certificate Huter was a non-borrowing or investment member, and paid eighty cents per share per month. Upon becoming a borrowing member, he paid $1.80 per share per month,—fifty cents per share for interest under the bond, fifty cents and eighty cents per share under his second or loan certificate. The additional fifty cents per share under the loan certificate he paid in his capacity of borrower. Whether this six per cent. per annum, payable monthly, be considered additional interest, or "premium" for the loan, or additional "dues" upon becoming a borrowing member, it was an item not charged against investing members. The borrowers continued to be investing members, and under their "loan certificates" paid eighty cents per share per month as investors and fifty for the privilege of being borrowers. Huter is chargeable with the amount of money received by him, with six per cent. interest from date, less the fifty cents per share per month paid as interest under the bond, and the like sums paid as additional "dues" under the loan certificate, and the amount paid the receiver, and all other sums paid except stock dues, to be computed as partial payments. The eighty cents per share per month, paid under both certificates, he is entitled to have allowed as a claim and to receive thereon his share of the residuum *pro rata* with other investors on their investments. *Marion Trust Co.* v. *Trustees of Edwards Lodge, ante,* 96.

Judgment reversed, with instructions to restate the conclusions of law in conformity hereto.