No. 26,797.

THE ÆTNA INSURANCE COMPANY et al., *Appellees*, v. FRANK L. TRAVIS (WILLIAM R. BAKER substituted), as Superintendent of Insurance, etc., *Appellant*.

(259 Pac. 1068.)

OPINION ON REHEARING.

SYLLABUS BY THE COURT.

1. JUDGES—*Qualification to Act—Having Acted as Prosecutor.* A member of this court who was attorney-general at the time an action was brought in the district court against the superintendent of insurance, which action was defended by assistants in the office of the attorney-general, is not for that reason disqualified to sit on the hearing of the appeal of such case in this court.

2. FIRE INSURANCE—*Reasonable Premium Rates—What Constitutes.* The premium rates, to produce a fair return, to which stock fire insurance companies are entitled, are such as will yield a fair return upon the present value of their capital used and useful in the insurance business, allocated to the state of the rate in question upon a consideration of all the insurance business transacted by such companies within the state compared with such business transacted by them elsewhere.

3. SAME—*Profits of Stock Companies—How Determined.* In determining profits of stock fire insurance companies consideration should be given to all earnings of such companies, including receipts from investments.

4. SAME—*Reasonableness of Premium Rates—Determination from Underwriting Business.* If the reasonableness of fire insurance premium rates is to be determined from the "underwriting business" only, it is essential that it be shown what part of the premiums, if any, ultimately become profits.

5. SAME—*Reasonableness of Premium Rates—Former Opinion Followed.* The legal principles stated in the former opinion in this case (121 Kan. 802, 257 Pac. 337) are adhered to.

Appeal from Shawnee district court, division No. 1; JAMES A. McCLURE, judge. Opinion on rehearing filed October 8, 1927. Reversed. (For original opinion of reversal see 121 Kan. 802, 257 Pac. 337.)

*William A. Smith,* attorney-general, *John G. Egan,* assistant attorney-general, and *John F. Rhodes,* of Kansas City, Mo., for the appellant.

*Robert Stone, George T. McDermott, Robert L. Webb, Beryl R. Johnson, Bennett R. Wheeler, S. M. Brewster, John L. Hunt,* all of Topeka, *E. H. Hicks* and *Robert J. Folonie,* both of Chicago, Ill., for the appellees.

Constitutional Law, 12 C. J. p. 887 n. 38. Insurance, 32 C. J. pp. 984 n. 57, 985 n. 68 new. Judges, 33 C. J. pp. 989 n. 3, 991 n. 48, 49, 1003 n. 19, 20, 26, 1005 n. 72; 15 R. C. L. 535. Statutes, 36 Cyc. p. 1103 n. 94.

The opinion of the court was delivered by

HARVEY, J.:  This case is here on rehearing.  It was decided in
November, 1926 (121 Kan. 802, 257 Pac. 337).  The six members
of the court sitting were divided, three to three, on some of the ques-
tions presented, and no decision was reached on those questions.
A rehearing was granted and the case was reargued in March of this
year.  Before a consultation could be had after that argument one
member of the court, Justice Mason, was taken sick.  He died on
May 4.  Wm. Easton Hutchison was appointed to succeed him.
Thereafter the court, on its own motion, ordered a rehearing before
the whole court.  The case was reargued at our July sitting.  At that
time plaintiffs filed a motion protesting against Justice Hopkins,

".  .  .  participating in the hearing and in the decision in this cause for
the reason that he was formerly attorney-general of the state of Kansas and as
such appeared for the defendant and represented him in said cause in the
trial court and directed the joining of the issues in said court and in deter-
mining the policy of the defense."

The motion points out the fact that Justice Hopkins did not sit in
either of the previous hearings in this court, nor participate in the
former decision, for the reasons stated in the motion, and the con-
tention is made that—

"Under these circumstances, the participation of his honor, Justice Hopkins,
in the consideration and the decision of this cause at this time, would amount
to a denial of due process and of the equal protection of the laws which are
guaranteed by the constitution of the United States."

Plaintiffs cite no statute, or constitutional provision, of this state
that would be violated or ignored by Justice Hopkins participating
in the consideration and decision of this case; neither do they specify
any particular in which such participation would deny to them due
process and the equal protection of the laws.

The protesting motion presents a preliminary question which
should be decided.  The facts pertaining to this question, as shown
by the record before us, including affidavits filed pertaining thereto,
are as follows:  Richard J. Hopkins, having been nominated and
elected according to our laws, became a member of this court on the
second Monday in January, 1923, and since that time has served as
a member of this court.  During the four years immediately prior
thereto he was the attorney-general of this state.

Much business of a legal and of an administrative nature passes

through the office of the attorney-general. By virtue of various statutes the attorney-general is a member of a number of state boards and commissions. His duties in connection with these, and the general administrative duties of his office, make it practically impossible, generally speaking, for him to give his personal attention to preparation and trial of lawsuits, or personally to conduct pending litigation. The office force consisted of four assistant attorneys-general and the requisite number of clerks and stenographers. The work pertaining to the preparation and trial of cases was performed almost exclusively by the assistant attorneys-general, the work being divided among them. J. K. Rankin, then an assistant attorney-general, now an attorney for one of the life insurance companies at Kansas City, had given special attention to the law of insurance, and to him were referred legal questions or litigation pertaining to insurance matters which came to the office of the attorney-general, and he handled them either alone or with the assistance of one or more of the other assistant attorneys-general of the office. When Frank L. Travis, superintendent of insurance, was making investigations and conducting hearings, in the fall of 1921, with respect to premium rates of stock fire insurance companies, he had Mr. Rankin present at one of the hearings or consultations with representatives of plaintiffs. In 1922, after the order complained of in this case had been made, plaintiffs filed this action in the district court, and summons was served upon Mr. Travis. He took the summons to Mr. Rankin and asked him to look after the case on behalf of the defendant. Mr. Rankin advised attorney-general Hopkins that the suit had been brought and was instructed to handle it for the defendant. Mr. Rankin, in consultation with Mr. Dennis Madden, an assistant attorney-general, and who had formerly been a district judge, prepared a demurrer to the petition and argued it in the district court. After the demurrer was overruled Mr. Rankin and Mr. Madden, and Mr. John G. Egan, who then was and now is an assistant attorney-general, conferred as to the further steps to be taken in the case and prepared and filed the answer upon which the case was tried. There was quite a little delay in the beginning of the actual trial of the case. This was occasioned, in part at least, by the illness and death of Mr. Bates, leading counsel for plaintiffs, and by the subsequent illness of Mr. Folonie, who succeeded Mr. Bates as the leading counsel for plaintiffs. At any rate, no evidence was taken in the case while Mr.

Hopkins was attorney-general. The first evidence was taken by deposition in December, 1923. The referee was appointed in the district court on June 10, 1924, and the taking of evidence before him was begun later. It is not contended, of course, that Justice Hopkins had anything to do with the trial of this case after he became a member of this court in January, 1923. Mr. Travis, the superintendent of insurance, and Mr. Dangerfield, the accountant in his office who had charge of the preparation of statistics to be used in the hearing, had all of their consultations with reference to the preparation of the case for trial with Mr. Rankin. They both state, that so far as they know Attorney-general Hopkins gave no personal consideration to the defense of the case or the legal questions involved. The statements of Mr. Rankin and the other assistant attorneys-general are to the effect that neither the facts in the case nor the merits of the order made by the superintendent of insurance, nor the facts on which such order was based, nor the manner of conducting the litigation, were discussed with Attorney-general Hopkins, nor directed by him. Hence, the record discloses that Attorney-general Hopkins did not handle the defense of this case personally, nor give any of the facts, nor the legal questions involved therein, his personal attention. While no doubt his name was signed to demurrers or pleadings filed within his term of office, he was only nominally or officially attorney for defendant, the active attorney for defendant being Mr. Rankin and other assistant attorneys-general.

Disqualification of a judge to sit in a cause by reason of the fact that he had been of counsel for one of the parties prior to becoming a judge is based upon the theory of supposed bias for that reason. In the absence of a statute disqualifying a judge for that reason, he is not disqualified. (33 C. J. 1002; *Butler v. Scholefield,* 54 Cal. App. 217.) The authorities hold that a prosecuting attorney who later becomes judge is not disqualified to sit in a case by reason of having had something to do with the preliminary stages of the prosecution, unless the statute specifically so provides. (33 C. J. 1005; *Eastridge v. Commonwealth,* 195 Ky. 126; *Hargis v. Commonwealth,* 135 Ky. 578; *State v. Bordelon,* 141 La. 611; *State v. Turnbow,* 99 Ore. 270; *Gandia v. Stubbe,* 29 Porto Rico, 141; *Kirby v. State,* 78 Miss. 175. See, also, *Barber County Comm'rs v. Lake State Bank,* 123 Kan. 10, 252 Pac. 475.)

So, even if we had a statute in this state disqualifying a member

23—124 Kan.

of this court from sitting in a case in which he had been of counsel, it would not, under the facts above stated and the authorities above cited, be applicable to Justice Hopkins in this case. But we have no statute, nor provision of our constitution, providing that a judge of this court is disqualified to sit in any case by reason of having been of counsel for one of the parties previous to his becoming a member of this court. We have such a statute with reference to district judges, in which case provision is made for calling in another judge, or selecting a judge *pro tem.*, to try the case. (R. S. 20-305, 20-306.) There is a similar statutory provision as to probate judges. (R. S. 20-1108.)

No provision of our constitution, or of our statute, prescribes conditions under which a member of this court is disqualified from sitting. Neither is there any provision of our constitution or statute for calling another judge to sit in lieu of one who may be disqualified. The framers of our constitution evidently took the view that any person who had the standing and qualifications to become a member of this court would not be presumed to be biased or prejudiced by reason of the fact that some time prior to becoming a member of the court he had been an attorney for one of the parties in the action, and our legislature obviously has consistently entertained the same view. Hence there is no legal disqualification of a member of this court to sit in a cause, unless it can be said to be the common-law reason for disqualification of one who had a pecuniary interest in the result of a cause. We need not decide in this case whether that would be a disqualification, for it is not contended by plaintiffs that Justice Hopkins, or any other member of this court, is disqualified for that reason.

Since there is no method provided by our constitution or statute for having another person sit as judge of this court, if one or more members should be disqualified in a case, it necessarily follows that they must sit, when their views are necessary to a decision. There is no way in which questions may be decided in this court except by the decision of the members of the court. If a member were to decline to sit for a reason which is insufficient, he might be compelled to sit by mandamus. (*Montfort v. Daviss*, 218 S. W. 806 [Tex. Civ. App.].) This court is organized to decide cases. There is no substitute for it, or for any one of its members, in our scheme of government. Litigants are entitled to have the essential questions

in their cases decided, and the members of this court cannot avoid the duty of deciding them (33 C. J. 989, and cases there cited), and certainly cannot do so for reasons that are legally insufficient.

It necessarily follows that plaintiffs' protest against Justice Hopkins participating in the consideration and decision of this case is neither well founded in fact nor supported by the law. It is therefore denied. Justice Hopkins took no part in the decision of this question.

Passing now to the merits of the case. The general statement of the case, made in the former opinion (121 Kan. 802-804, 257 Pac. 337) need not be repeated. We have before us, speaking in a large way, the single question: Was the order made by defendant, in so far as it pertains to fire insurance premium rates, unreasonable, unjust and inequitable? The trial court regarded this as including the following questions, each of which was considered and determined: (1) Should the rate be fixed so as to yield to plaintiffs a reasonable percentage of the underwriting profits independent of their capital and surplus, or should it be fixed so as to yield a reasonable return upon the amount of their capital and surplus allocated by some proper method to the state of Kansas? (2) In determining the income of plaintiffs, should consideration be taken of their investment earnings? (3) What is the proper basis upon which to predicate the rate of return? (4) Is the order void or unreasonable because it attempts to adjust the rates according to occupancy or vocational classifications without regard to the fire hazard contained in the individual risk? And (5), in view of the conclusions reached in the foregoing propositions, does the order provide a proper and reasonable return to plaintiffs?

Taking up these questions: (1) Upon what are plaintiffs entitled to make a reasonable profit—the value of their capital stock allocated to this state, or their premiums? In other words, should a reasonable premium rate provide a return which, after the payment of losses and expenses, will yield a fair per cent of profit upon the value of the capital employed in the business, or, should capital employed in the business be disregarded, and the return computed upon the amount of premium receipts only and so as to yield a fair per cent of such premiums as a profit? Obviously this lies at the threshold of our inquiry, for until this is determined it is difficult properly to consider the other questions. There is no decided case directly in point as a precedent. Textbooks and articles in encyclo-

pedias upon insurance are distressingly silent upon the question. Even the late work of Hardy on "The Making of the Fire Insurance Rate" treats the question purely from an underwriting viewpoint, and does not discuss the question of rates as to producing a fair return or profit. Possibly that is accounted for by the fact that, for the most part, heretofore state statutes regulating stock fire insurance companies pertained more generally to the amount of capital stock and surplus, how it should be paid in, invested, cared for and reported; to regulations pertaining to solvency, the payment of dividends, the forms and conditions of policies, and to preventing discrimination in premiums upon similar risks. Only in recent years, and only in a few states, are statutes found authorizing the state, or some designated board or official thereof, to fix premium rates; and in these states litigation has reached the supreme court in but two cases—*Ætna Ins. Co. v. Hyde,* 285 S. W. 65 (Mo.), and *Bullion v. Ætna Insurance Co.,* 151 Ark. 519—but in neither of these cases was the question here to be determined presented or considered. In the Hyde case the parties agreed that the profits should be computed "on the underwriting business done." In the Bullion case there was a state statute (C. & M. Dig. [Ark.] § 5969) which required the profits to be computed upon the "aggregate underwriting profit." In the opinion it was said:

"There is a vast difference between constitutions or statutes which merely protect public utilities in the right to a fair and reasonable return on their business and those statutes which guarantee a certain fixed per cent or profit. See *Galveston Electric Co. v. Galveston* [D. C.], 272 Fed. 147." (p. 542.)

In this case there is no agreement between the parties upon the question as there was in the Hyde case, and the test required by our statute (R. S. 40-463), unlike that in the Bullion case, is that "the rate must be reasonable."

The question before us has been many times determined in analogous cases dealing with public utilities and other public service corporations, in which, from the nature of their respective businesses, the public has such an interest that the state, or some board or commission provided by it, is authorized to fix the rates they may charge for their services. In these cases of late years it has been uniformly held that the companies are entitled to a rate which, after the payment of proper and necessary expenses and charges, will yield a reasonable return upon the value of their property used and useful in the business. The latest holding of the supreme court of the

Ætna Ins. Co. v. Travis.

United States upon that question is in *Board of Public Utility Comrs. v. New York Teleph. Co.,* 70 L. Ed. 808, in which it was said:

"The just compensation safeguarded to the utility by the 14th amendment is a reasonable return on the value of the property used, at the time that it is being used for the public service." (p. 812.)

This is the settled holding of the courts upon the question. Many cases have dealt with the question, but it is not necessary to cite numerous authorities. We fully agree with the principles pertaining to the determination of rates stated in the case last cited. In *German Alliance Ins. Co. v. Kansas,* 233 U. S. 389, it was held that the business of fire insurance is so far affected with a public interest as to justify legislative regulation of its rates. But plaintiffs contend the rule above stated cannot apply to stock fire insurance companies, for the reason that the capital and surplus of such companies is not property used or useful in the business in the sense that the property of a public utility is so used and useful; that it is not invested in franchises, rails, street cars and street-car barns, etc., as is the property of a street-car company; nor in telephones, poles, lines, conduits, etc., as that of a telephone company; nor in mains, meters, etc., as is the property of a gas or water company. There is no merit in this contention. Naturally it would not be invested in this class of property—each utility, industry, or business invests its money as its peculiar business requires—but there is no room for holding, as contended by plaintiffs, that it is not used and useful in the insurance business. The very nature of the insurance business requires that stock companies engaged therein have capital and surplus with which to conduct the business. The statutes require insurance companies to have capital and to have surplus, to invest it in particular securities, and such investments are, by statute, regulated and supervised with the utmost care. (R. S. 40-201 *et seq.*) Most of the states, perhaps all of them, have now, and have had for years, statutes pertaining to and authorizing the regulation of the amount and the use and investment of the capital and surplus of insurance companies. The officers and directors of the insurance companies could no more use their capital and surplus in a business, or in a manner, not authorized by the statute than could the utilities company get along without rails, street cars, telephone wires, poles, conduits, or gas or water mains or meters, as the nature of their respective businesses requires. One who invests his money in the

capital stock of an insurance company devotes it to an insurance business just as thoroughly and as completely as does one who invests in the capital stock of a public utility company devote his money to that business. When any business becomes so clothed with the public interest that it is subject to legislative regulation and control, included in which regulation is the authority to fix rates, which rates must be so fixed as to be reasonable and enable the business to make a fair return, there can be no reason for classifying such businesses and saying that the reasonable yield or fair return should in one class of them be computed upon the value of its property used and useful in the business, and that the yield and fair return on another class of such companies should be computed upon the basis of income, disregarding the capital employed in the business. But plaintiffs argue that persons who invest in the stock of an insurance company could have purchased government bonds or other similar securities, such as insurance companies are required to invest in, and received the return that comes from such investment without going into the hazardous business of insurance. There is no reason why that could not be said of stockholders of any corporation engaged in a business impressed with a public interest. One is not compelled to invest his money in the capital stock of companies conducting electric railways, or telephones, or the gas or water business, or the insurance business. He could if he chose, buy government bonds or other stable securities and receive the returns which those investments yield without being put to the hazard of placing his money in such utilities. But this is not a reason why, in computing a reasonable rate for the utility, the investors or stockholders of the utility should first be allowed a return such as their money would have yielded if invested in stocks or bonds, and in addition thereto that the company should be allowed a reasonable return, not upon the value of its property used and useful in the business, but upon the amount collected from its patrons for services performed. We can conceive of no reason why such a rule should apply to an insurance company. The question which an investor asks when placing his money in any business, whether it be a private business, or a business clothed with a public interest, is, what will be the net returns upon the money invested? In the closing up of a business, whether by a voluntary or forced liquidation, the net assets are disbursed on the basis of money invested as represented by the capital. The primary

question considered when the investment is made is: What return will the money invested yield? And the final test on the closing of the business is: What has the money invested in fact yielded? Plaintiffs argued that their capital and surplus is not invested in the insurance business, but is simply put up or impounded, as an evidence of good faith, as security that they will carry out and perform their insurance contracts; that the business of writing insurance is a service to the insured, and hence that charges should be made only upon the service rendered. The business of writing insurance is something more than a service—it is an indemnity, and an indemnity requires funds, not only to secure, but to pay. That is the reason for statutes requiring capital and surplus to be actually paid and to be kept available for the payment of indemnity. Under the statutes relating thereto, the capital and surplus of plaintiffs is devoted entirely and exclusively to the insurance business, as a business, and is and can be devoted to no other purpose.

The face value of the capital stock of any corporation is seldom a true guide to its real value, and that is true of insurance companies. Regarding all of the assets of an insurance company as being used in the insurance business, the reasonable value thereof at the time the inquiry is made should be the basis upon which to compute a reasonable return. Because of the class of securities in which investments of capital and surplus are required to be made, this can be determined with reasonable accuracy. In the report of the joint committee of the legislature of New York appointed to investigate the affairs of insurance companies, other than life insurance, and make a report and recommendation to the legislature, after considering the various methods contended for of computing profits of fire insurance companies, and the inaccurate conclusions which the contending parties had drawn therefrom, is used this language:

"This illusion largely disappears when we consider carefully upon what basis the earnings should be figured. In reality, the amount of the·capital of a fire insurance company has very little significance; it is scarcely anything beyond a basis for computing the ownership of the company. The real capital, in the economic sense, that the stockholders have in the business is to be valued either as what the business would bring if sold as a going concern, or as what it would bring if liquidated. The former, the market price, would in general be greater than the latter by the value of the good will of the business. The sum for which the business could be liquidated, which we may call the proprietorship or the 'proprietary interest' would be, in general, the capital, the surplus, and say 30 per cent of the reinsurance reserve (for the reason that the business could be reinsured for about 70 per cent of the reserve; . . .).

"Now this method of figuring profits is the method that is used in every other kind of business, and there is no reason why it should not be equally valuable in fire insurance. It certainly answers the question which the prospective buyer of fire insurance stock wishes to have answered, namely, 'How much, taking into account all sources of income, underwriting profit, interest and gain from sale of securities, will my investment yield?' It certainly answers the question which the public is interested in: 'What, taking everything into account, has the fire insurance business yielded? Have the profits been excessive? if so the premiums must have been too high.'" (20 New York Assembly Documents, p. 56 [1911].)

This committee recommended, among other things, that the state should not undertake the business of fixing rates for fire insurance for stock fire insurance companies, for the reason that the competition of mutual and reciprocal fire insurance companies, the possibility of the formation of other stock fire insurance companies, and the constant insistence of the insured for lower rates, would tend to prevent unreasonably high rates by joint-stock companies. But the question, whether the state should undertake to fix fire insurance rates, is not before us. Whether wisely, or unwisely, our state has done so, and the prudence of that is a legislative question, not a judicial one. The report of the commission is important, however, upon the question of the correct basis to compute the earnings of stock fire insurance companies.

It is argued that to fix rates to yield a fair return on the value of capital would force the placing of different rates for the separate companies, for the reason that some of them have much larger capital than others; but this contention is erroneous. Even a greater discrepancy would appear if separate companies were to be treated as to their premium income less expenses and losses, for this, as to the different companies, shows a much greater variation than there is in their capital stock. But both of these considerations are eliminated when we consider, as we must, that separate rates of premium on specific property cannot be made for different companies. To do so perhaps is impossible, certainly is impracticable and undesirable. For the purpose of determining rates of premiums, plaintiffs must be considered as a whole, just as though collectively they constituted one company, and the rate established for a specific property must be one which each of the companies may use. In this case it is conceded this is true. The result may be, and is, that some of the companies will make more profit than others; some may sustain an actual loss. This is inevitable. It arises from many causes—the selection of risks, the volume of business written, the expense in

Ætna Ins. Co. v. Travis.

proportion to the business, and the losses which are sustained, which necessarily are variable from many causes.

Defendant has contended that the amount of the capital and surplus, actually paid in by the stockholder at the time the insurance companies were organized, and additional payment to capital and surplus by the stockholders, not derived from earnings (allocated to this state), is the sum upon which plaintiffs are entitled to make a reasonable return. But this is inaccurate. The present capital and surplus of plaintiffs is made up in part by past-accumulated earnings, some of which has been disbursed as stock dividends and some of which has been retained as surplus, although under the statute it could have been disbursed either as cash or stock dividends. This forms as much a part of the present value of the capital of plaintiffs as though it had in fact been disbursed to the stockholders and by them reinvested in the capital and surplus of their respective companies. Though plaintiffs' profits in the past may have been large, that is not a reason they should now be required to do business at a rate which will not yield a reasonable return upon the present fair value of their property actually used and useful in the insurance business. (*Newton v. Consolidated Gas Co.*, 258 U. S. 165, 175.) Since plaintiffs do business in other states, and some of them in foreign countries, this value should be allocated to this state in the proportion that the insurance business transacted by plaintiffs in this state bears to their total insurance business. In the referee's report there is a discussion of different methods of making such an allocation, if one were made, and of different results obtained by different methods of computation. Since, in the court below, the reasonable return was not computed upon the reasonable present value of the property of plaintiffs used and useful in the insurance business, and no allocation thereof to this state was made, we do not feel called upon to determine between two or more methods of computing such allocation, any further than to say that such allocation should be made upon consideration of all the insurance business transacted by plaintiffs in this state as compared with all the insurance business transacted by plaintiffs elsewhere. We apprehend there will be no difficulty in finding a proper method of making such allocation, when it is once attempted. It was error for the court below to disregard the value of plaintiffs' capital and to take the premiums received by plaintiffs as a basis upon which to compute a reasonable return.

Turning our attention to the next question: (2) In determining

the income of plaintiffs should consideration be taken of their investment earnings? Plaintiffs contend their investment earnings are entirely independent and distinct from underwriting profits and should not be included in their gross income for rate-making purposes. We are unable to see merit in this contention. No reason suggests itself why the business of insurance should not be regarded as a whole. So far as the real owners of the business, the stockholders, are concerned, all income arising from the business, and all expenses and loss incident thereto, should be considered, and must of necessity be considered, in determining whether or not there has been a profit, and the extent and amount thereof. Defendant contends R. S. 40-214 requires income from investment to be considered. By R. S. 40-111, 40-113, 40-206, it is clear that investment earnings are regulated and safeguarded. In estimating profits for the purpose of declaring dividends unearned premiums are required by statute to be reserved. This requirement is primarily in the interest of solvency, as will be later discussed. Plaintiffs call our attention to the *Minnesota Rate Cases,* 230 U. S. 352, and allied cases, which hold, in substance, that assets and property of a public utility not devoted to public service cannot be considered as a basis of rate-making. The rule is sound in reasoning and is sustained by an array of authority. The difficulty of applying the doctrine of these cases to stock fire insurance companies, and especially to the case before us, is that there is no showing that the capital or surplus of plaintiffs, or any part of it, is not used in the insurance business. In fact, the testimony from each of the officers of plaintiffs who testified upon the subject is that capital had been increased from time to time and the surplus had been, in part, retained and not disbursed to the stockholders because it was advantageous to plaintiffs in the insurance business. It is argued that separate employees, and in some instances separate officers of the company, devote their time to investment, while others give attention to the underwriting. This is not a reason for regarding the businesses as separate. In any large business no one person can transact all of it. The fact that some employees or officers devote their time to a particular part of the business rather than to another is no indication that all of it is not a part of the insurance business as a whole. Plaintiffs speak of the investment portion of their business as a banking business, or the banking end of their business. In a series of decisions, years ago, the distinction between the insurance business and the banking busi-

ness was noted, and it was held the one did not embrace the other. (*New York Fire Ins. Co. v. Ely,* 5 Conn. 560; *The Ætna Nat. Bank v. Charter Oak Life Ins. Co.,* 50 Conn. 167, 183; *Blair v. Perpetual Insurance Company,* 10 Mo. 559; *Ohio L. I. & T. Co. v. Merchants', etc., Co.,* 11 Humphrey 1 [Tenn.]; *Life Association of America v. Levy,* 33 La. Ann. 1203; *Huter v. Union Trust Co.,* 51 N. E. 1071 (Ind.); *Myers v. Mutual Life Ins. Co.,* 153 Ind. 204; *Robotham v. Prudential Insurance Co.,* 64 N. J. Eq. 673; *National Bank of Washington v. Insurance Co.,* 41 Oh. St. 1.)

In *Memphis v. Memphis City Bank,* 91 Tenn. 574, the court held that a corporation entitled the "Memphis City Fire and General Insurance Company," whose officers are authorized to write insurance of various kinds, "and generally to do all things necessary and proper in carrying on the general insurance business," is not empowered to do a banking business, although its charter provides that it may purchase, hold, and convey any and all kinds of estate, real, personal, or mixed, receive in trust money or other valuable things, and loan surplus funds on any stocks of any incorporated company, or of the United States, or "invest them in any real or personal estate, or choses in action, or other good securities."

And, on appeal of that case to the United States supreme court, 161 U. S. 186, touching the claim of the company that it had, by legislative authority, changed its business from an insurance business to a banking business, and was then entitled to certain exemption from taxation which it enjoyed while conducting an insurance business, the court said: "We think the change from the business of insurance to that of banking is a material and radical change," and denied the contention.

Plaintiffs are not incorporated as, and do not have the functions of, banks. They are insurance companies, required by law to have a capital and surplus with which to conduct their business; and all of their business transactions, their underwriting and their investments, are supervised and regulated for the common good, because the business as a whole is one clothed with the public interest. (*German Alliance Ins. Co. v. Kansas,* supra.) In the case of *Ætna Ins. Co. v. Hyde,* supra, it was held that the income from investments representing capital and surplus should not be considered, but the income of investments representing unearned premium should be considered. Upon this point there was a division of opinion among the members of the court.

It may be noted that since the controversy in that case arose the Missouri legislature enacted a statute (act approved March 21, 1923, amending § 6283 Rev. Stat. 1919) requiring the superintendent of insurance, in determining the question of rates and profits, to take into consideration, among other things, "all earnings of such companies, including investment profits." While we agree with the Missouri court that income from investments from unearned premiums should be taken into account, we are unable to see a good reason for not taking into account income from investments of capital and surplus. All of it is income for the companies; it is a part of the insurance business, and should be considered together with income from premiums, and any other income of the business. It was error for the court below to disregard income from investments.

Passing to the next question: (3) upon what principle should underwriting profits be computed? or, as may be otherwise stated, what premiums shall be considered and what losses and expenses shall be considered in determining the underwriting profits of plaintiffs? Since we have already determined that rates should not be based on underwriting profits only, but should include a consideration of all the income and all expenses and losses, this question becomes of secondary importance; but a brief discussion of it may be helpful. In *Bullion v. Ætna Insurance Co.*, 151 Ark. 519, decided under a statute which required premium rates to be determined by the "underwriting profits," the definition of that term was important; but, as previously pointed out, that is not true under our statute, which does not use the term "underwriting profits," but which makes the reasonableness of the order affecting rates the only test. On this branch of the case it is not necessary to elaborate extensively what was said in the former opinion (121 Kan. 802, 805-811, 257 Pac. 337). One correction should be made. It was there stated: "Incurred losses and expenses . . . average, from year to year, from 10 to 12½ per cent more than losses and expenses annually paid." While the evidence as to some of the plaintiff companies showed the difference to be that great, considering all the plaintiffs, the difference is not so much. We adhere to the view, previously expressed, that in determining the profits of plaintiffs, losses and expenses should not be computed substantially greater than they are. Since the filing of the former opinion a great deal

Ætna Ins. Co. v. Travis.

has been said in the briefs and oral arguments with reference to premium receipts, as there discussed; but the question, what profit the premium receipts yielded, is still unanswered. The real difficulty with plaintiffs on this branch of the case is this: After having persuaded the referee and the court below to disregard the value of the capital used in the insurance business (properly allocated to this state) as the sum on which they are entitled to make a reasonable profit, and to disregard income from investments required by statute to be made by them in conducting the insurance business—both of which conclusions we have now determined to be erroneous—and having the inquiry as to their profits limited to premium receipts, less losses and expenses, they have failed to show what has become of all the premium receipts; what profit, if any, resulted from premiums received. If profits of plaintiffs are to be computed from the "underwriting business" alone, the method pursued is not important. All that is required is that it be some accurate method, and that it be complete.

The method used by plaintiffs in this case was both inaccurate and incomplete. It was inaccurate in the one respect, at least, of computing losses and expenses substantially greater than they were. It was incomplete in that it did not show what part of the premiums ultimately became profit. The result is that there is a fatal hiatus in the proof. It must be remembered that the gist of plaintiffs' complaint in this action is that the order made by defendant, sought to be enjoined, so reduced rates that plaintiffs were unable to make a reasonable profit. How is it possible to establish that fact without showing what part of the premiums, if any, ultimately became profits? Obviously, such a showing is essential. The order made by defendant is presumed to be reasonable—to be one that would enable plaintiffs to make a reasonable profit in the conduct of their business. The burden was on plaintiffs to establish their allegations that it was unreasonable and confiscatory. They failed to make that showing. It is worthy of note that plaintiffs, since the filing of the former opinion, no longer contend that *Sun Insurance Office v. Clark,* [1912] A. C. 443, supports their contention that in computing profits of an insurance company unearned premiums should be disregarded—it seems clear that what was decided in that case had been misinterpreted. It is contended, however, that the Bullion case (*Bullion v. Ætna Insurance Co.,* supra) is an authority

for such holding. As previously noted, this case turned on the interpreting of the state statute. The court even took evidence of the author of the bill and of the ideas he had in mind as to the meaning of the language used, and followed what it found to be the legislative intent. The statute differs from ours. The case is neither controlling nor persuasive here.

Another question should be discussed. It was one of the contentions of plaintiffs that the order complained of was void because of the form of the order; that is, because it attempts to adjust rates according to occupancy or vocational classification of the property insured, and also because the increases and decreases were made a named percentage of the final rate rather than the basic rate. Much evidence was taken on this question and it was argued at length before the referee. In the written memorandum filed by the referee with his findings, the evidence and arguments pertaining to this feature of the case are treated at length, and this order criticized in some respects, but with this conclusion:

"So that scientifically unsound as I believe it to be, upon the whole I do not regard it as sufficiently serious to say that it is therefore void."

When the matter came before the district court the question was again argued. In the memorandum opinion filed by the trial court the question is discussed, together with the report of the referee thereon, with this conclusion:

"The foregoing views were adopted by the referee in his report and I am also in agreement with his conclusion that while the system adopted by the superintendent is faulty and inferior to the analytic system, yet that fact in itself does not necessarily vitiate the rate order, providing discriminations are not too glaring and an adequate return is attained. The court will, therefore, approve the referee's report in respect to this objection and proceed to a consideration of more serious and vital propositions hereafter discussed."

In the former opinion this question was treated as follows:

"Is the order void or unreasonable because it attempts to adjust rates according to occupancy or vocational classifications without regard to the fire hazard contained in the individual risks? The trial court held the order made by defendant was not void for this reason. From this ruling there has been no appeal, hence, we need give the matter no further attention." (p. 804.)

Plaintiffs complain bitterly of this and say that they had in effect appealed from the ruling of the trial court on this question; that is, they had argued in their brief that it was erroneous, which they regard as a sufficient cross appeal under the rulings of this

court, and further argue that they could not have appealed from it for the reason that the decision as a whole was in their favor, and further that the question should be considered in any event; for, if the trial court's general conclusion in their favor was correct, it should stand, even though reasons given by the trial court were found to be erroneous. On January 5, 1927, plaintiffs served on counsel for appellant and filed in this court, as provided by R. S. 60-3314, a notice asking consideration and review of parts of judgment, orders, findings and opinion of the trial court. In so far as plaintiffs seek a review of the adjudication of "the first four" of plaintiffs' principal contentions, the request is made too late, those questions having been originally adjudicated by Judge Whitcomb more than six months before any appeal to this court was taken. (*King v. Stephens,* 113 Kan. 558, 563, 215 Pac. 311.) As to whether the order was void because of its form, the notice for review is in time. We have considered all the evidence and argument pertaining to this question and have reached the same conclusion thereon as was reached by the trial court. So far as making the order apply by a percentage increase or decrease of the final rate rather than the basic rate, it is not only mathematically correct, but is the effective way for the order to be made. It is mathematically correct because the rate was constructed beginning with a basic rate, to which was added various percentages of the basic rate for real or supposed hazards growing out of construction, occupation, location, fire protection, etc. Hence, a decrease or increase of the final rate decreases or increases not only the basic rate but each of the additions thereto by percentage and in the same proportion that they were added to it. It is also the practical method of doing so, for there is no difficulty in computing an increase or a decrease of the final rate by a given per cent. Plaintiffs argue that it could be best accomplished by an increase or decrease of the basic rate, but the evidence does not bear that out. Prior to 1918 the basic rate in this state was lower than the basic rate in Missouri, but the evidence disclosed that the final rate in Missouri was lower than in Kansas. In 1918 the basic rate in Kansas was reduced, and yet the readjustment of the final rate, based on the *decreased* basic rate, was shown by the evidence to result in an *increased* final rate. Just what produced this anomalous situation is not made clear, but in view of that experience the effective way to increase or decrease the rate was to make the order applicable to the final rate. So far as the order

is based on occupancy or vocational classification, it is inaccurate to say it is wholly so based. The existing rate already includes consideration of all elements pertaining to construction and location, as well as occupancy. These were not removed by the rate order, but continue to exist in the final rate as modified. The order was based on the best information obtainable, after repeated requests by defendant that plaintiffs supply all data and information they possessed pertaining to the question; and while possibly not perfect— as perhaps it is impossible for any schedule of this character to be perfect, no matter by whom it may be compiled—there is nothing in the record to disclose that it should be held void because of its form. If this matter can be regarded as being before us, we reach the same conclusion as the referee and the trial court, namely, that the order complained of is not void for this reason. Further discussion on this point is unnecessary.

In view of the conclusions reached upon the foregoing propositions, has it been shown that the order made by defendant is unreasonable and confiscatory? This must be answered in the negative. The referee found, and it is in effect conceded in this case, that if the rate should be fixed so as to yield a fair return upon the value of plaintiffs' capital allocated to this state upon any of the methods suggested, rather than upon the underwriting profits only, the order sought to be enjoined was not unreasonable. We have determined that the rate should be fixed so as to yield a fair return upon the value of plaintiffs' capital allocated to this state by consideration of all the insurance business transacted by plaintiffs in this state compared with such business transacted by them elsewhere.

The referee found that if consideration was to be given to investment earnings, the order was not unreasonable. We have determined that consideration should be given to all the income of plaintiffs, including investment earnings.

The referee found that unless the method employed by him in determining underwriting profits—that is, of deducting incurred losses and expenses from earned premiums, plus 35 per cent of unearned premiums—was correct, then the order was not unreasonable. We have determined that this method is incorrect, and further, that rates should not be determined upon underwriting profits alone.

Other questions, some of them pertaining to procedure, are argued by the parties, but we do not find it necessary to refer to them.

From what has been said it necessarily follows that the judgment of the court below be reversed, with directions to enter judgment for defendant. It is so ordered.

JOHNSTON, C. J., and DAWSON and HUTCHISON, JJ., concurring.

HOPKINS, J., concurs in all except the question discussed in the first paragraph of the syllabus, in which he took no part.

BURCH and MARSHALL, JJ., concur on the question discussed in the first paragraph of the syllabus, and dissent from the remainder of the opinion.